**FAIRVIEW MACHINE & TOOL CO., INC., Plaintiff,**

v.

**OAKBROOK INTERNATIONAL, INC. & Nuway Paper, L.L.C., Defendants.**

No. CIV.A. 99–30045–MAP.

United States District Court, D. Massachusetts.

July 21, 1999.

Robert L. Leonard, Doherty, Wallace, Pillsbury & Murphy, James J. Bregianes, Doherty, Wallace, Pillsbury & Murphy, P.C., Springfield, for Fairview Machine & Tool, Co., Inc., Plaintiffs.

Kevin C. Maynard, Bulkley, Richardson & Gelinas, Springfield, Ronald C. Spradley, Spradley & Riesmeyer, Kansas City, Mo, for Oak Brook International, Inc., Defendants.

*MEMORANDUM REGARDING DE-
FENDANTS' MOTION TO DIS-
MISS OR IN THE ALTERNATIVE
TO TRANSFER VENUE, AND
PLAINTIFF'S MOTION TO TAKE
DISCOVERY*

(Docket Nos. 6, 11)

PONSOR, District Judge.

## I. INTRODUCTION

This case arises out of the defendants' refusal to make final payments of approximately $400,000 for machinery they ordered from plaintiff. Defendants, non-Massachusetts businesses, move to dismiss on the ground that this court does not have personal jurisdiction over them. Alternatively, defendants move to transfer venue to the Western District of Michigan as a matter of convenience. In the event that the court is inclined to allow the motion to dismiss, plaintiff moves to take discovery relevant to its opposition to dismissal.

For the reasons set forth below, this court will deny the motion to dismiss, deny the motion to transfer venue, and deny the motion to take discovery.

## II. FACTS AND PROCEEDINGS

Fairview Machine and Tool Company ("plaintiff") is a Massachusetts corporation with approximately fifty employees that produces complex machinery used in the manufacture of paper products. Defendant Nuway is a Delaware company with its headquarters in Chicago, Illinois; defendant Oakbrook is an Illinois corporation (collectively "defendants"). Robert K. Regan is the president and one of two owners of Nuway; he is also the president and owner of Oakbrook.

In 1996, Nuway planned to start a paper manufacturing facility in Benton Harbor, Michigan that would produce lightweight coated paper (referred to in the industry as "LWC"). Production of LWC involves numerous pieces of interdependent equipment on a manufacturing line.

Regan contracted with the Kohler Coating Machinery Corporation, which is based in Ohio, to furnish some machinery for the LWC manufacturing line and to provide overall project management for the installation of the manufacturing line at the Benton Harbor plant.

Kohler, which had prior business dealings with plaintiff, contacted plaintiff about the possibility of producing machinery for the "calendering system component" of an LWC line, and on November 12, 1996, plaintiff sent a written proposal to Kohler. (Docket No. 12, Exhibit 1). At that point, Kohler had not identified either Nuway or Oakbrook as the potential customer for plaintiff's machinery. Eventually, however, Kohler asked plaintiff to send a more detailed proposal for the paper manufacturing machinery to Oakbrook in Illinois. (Docket No. 8 at 2).

On February 7, Regan telephoned a Fairview representative, Bruno Raynes, to accept the proposal. (Docket No. 12). Six days later, in his capacity as Oakbrook's CEO, Regan sent Fairview a purchase order. (Docket No. 12, Exhibit 5). Communications between the parties concerning the contract continued, and plaintiff sent Nuway a revised agreement on March 17, 1997. Under the revised agreement, the machinery was to be shipped "F.O.B. Chicopee, Massachusetts," meaning that plaintiff's delivery obligations would be complete when the machinery was made available to a carrier in Chicopee, and the defendants were to be notified to inspect the machinery prior to shipment. The price of the machinery was approximately $1,982,500, to be paid in several installments: 25% with the purchase order, 25% on production release, 25% on shipment, 15% on delivery and inspection at defendants' plant, and 10% on acceptance. (Docket No. 12, Exhibit 10).

Plaintiff constructed the machinery in Chicopee, Massachusetts for approximately eleven months. Significantly, on at

least two occasions, Nuway representatives visited plaintiff's facility in Massachusetts in connection with the construction of the calendering system equipment. First, on July 30, 1997, Mark Baybos, a Nuway systems administrator in the Benton Harbor plant, attended a project review meeting with representatives of plaintiff and Kohler at plaintiff's Chicopee facility. (Docket No. 16). Second, Dennis Forrester, the plant manager for Nuway's Benton Harbor facility, traveled to plaintiff's Chicopee plant on September 18, 1997 to check on the status of the manufacture of the calender system. (Docket No. 9). During his visit, Forrester met with plaintiff's project manager for the Nuway machinery. According to Forrester, the purpose of his visit was "to determine the status of the project, whether or not there were going to be any problems with the manufacture or delivery of the calender and to report back to my superiors at Nuway Paper." (*Id.*).

The defendants also made telephone calls and sent over forty faxes and letters to plaintiff in Massachusetts relating to the machinery during the construction process, and sent checks totaling more than $1,500,000 in partial payment for the machinery to Massachusetts. (Docket No. 11 at 11). In addition, at least seven Kohler representatives visited plaintiff's facility or attended meetings there to review the construction.

Eventually, problems arose that delayed the Benton Harbor plant from becoming fully operational on schedule. Because of these problems, which defendants attributed at least in part to plaintiff, Nuway did not pay the last two invoices from plaintiff, which totaled about $400,000.

Plaintiff then filed this action in Hampden County Superior Court alleging breach of contract, quantum meruit, promissory estoppel, misrepresentation, and unfair trade practices. Defendants removed the case to federal court in March 1999 and now seek to dismiss or to transfer venue.

## III. DISCUSSION

### A. Motion to Dismiss

■ Defendants move to dismiss, arguing that their contacts with Massachusetts are insufficient to confer personal jurisdiction. The First Circuit recognizes two types of personal jurisdiction, general and specific. *See United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir.1992). "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Id.* Here, plaintiff does not assert general jurisdiction and defendants clearly have not engaged in continuous and systematic activity in Massachusetts. General jurisdiction is therefore lacking.

■ Specific jurisdiction exists where "the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *Id.* at 1088–89. "The proper exercise of specific *in personam* jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir.1994).

■ The Massachusetts long-arm statute provides that "[A] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth; ..." Mass. Gen. Laws ch. 223A, § 3. The physical presence of a defendant in Massachusetts is not required; rather, the court looks to whether a defendant "attempted to participate in the Commonwealth's economic life."*Pleasant St. Corp.*, 960 F.2d at 1087.

■ Courts construe the Massachusetts "transacting any business" clause broadly. *See Hahn v. Vermont Law Sch.,* 698 F.2d 48, 50 (1st Cir.1983); *Bennett v. Jack Dennis Whitewater Trips,* 925 F.Supp. 889, 894 (D.Mass.1996) (citation omitted). In *Hahn,* for example, the "transacting any business" provision was deemed satisfied where the defendant, Vermont Law School, had merely mailed application information and an acceptance letter to the plaintiff in Massachusetts. *See Hahn,* 698 F.2d at 51; *see also Bond Leather Co. v. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 932 (1st Cir.1985) (finding defendant's "activities are within the reach of § 3(a)" where defendant, which guaranteed a Massachusetts plaintiff payment for goods, mailed four letters to Massachusetts and received a telephone call from plaintiff in the course of negotiations); *L & P. Converters, Inc. v. H.M.S. Direct Mail Serv., Inc.,* 634 F.Supp. 365, 366 (D.Mass.1986) (finding that defendant transacted business in Massachusetts within the meaning of section 3(a) where it had "done nothing to participate in the Massachusetts economy beyond placing the phone orders from New York.")

■ In this case, where two of the defendants' employees, including Nuway's plant manager, visited plaintiff's facility in Massachusetts and where the defendants sent substantial correspondence, including approximately $1,500,000, into the Commonwealth, the defendants transacted business within the meaning of the broadly construed Massachusetts long-arm statute. Thus, the first requirement for specific personal jurisdiction over the defendants is satisfied.

■ The inquiry therefore turns to whether the exercise of personal jurisdiction over the defendants comports with constitutional requirements. Specifically, the Due Process Clause of the United States Constitution requires that there be sufficient minimum contacts between a defendant and the forum. The First Circuit's minimum contacts analysis rests on three factors: first, plaintiff's claims underlying this litigation must relate to defendants' Massachusetts contacts; second, defendants' Massachusetts contacts must represent a purposeful availment of the privilege of conducting activities in Massachusetts; and third, the exercise of jurisdiction over defendants in the circumstances of this case must be reasonable in light of several "gestalt" factors. *See Pritzker v. Yari,* 42 F.3d 53, 60–63 (1st Cir.1994) (citations omitted). As the First Circuit has observed, "[d]ivining personal jurisdiction is more an art than a science," *Ticketmaster–New York v. Alioto,* 26 F.3d 201, 206 (1st Cir.1994), and "is also highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case." *Pritzker,* 42 F.3d at 60.

This court will consider each of the three factors in turn.

### 1. *Relatedness*

■ The focus of the relatedness requirement is on "the nexus between the defendant's contacts and the plaintiff's cause of action." *Ticketmaster–New York,* 26 F.3d at 206. It is "a flexible, relaxed standard." *Pritzker,* 42 F.3d at 61. In this case, plaintiff's claims focus on the defendants' refusal to make the final payments for the calendering machinery, and several facts demonstrate the necessary "nexus."

■ The machinery was built and delivery was completed in Massachusetts; defendants' representatives traveled to Massachusetts to view the machinery and to discuss its construction and, in the words of the Benton Harbor plant manager, "whether or not there were going to be any problems with the manufacture or delivery of the calender;" defendants made telephone calls and sent correspondence related to the equipment as well as payment for the calendering system to Massachusetts; and defendants received numerous communications, including the revised

agreement, from Massachusetts. These facts demonstrate that the defendants' contacts with Massachusetts plainly relate to plaintiff's claims arising from the defendants' refusal to make the final payments for the machinery. The relatedness element of the due process analysis is therefore satisfied.

### 2. *Purposeful Availment*

The next step in the analysis is to determine whether defendants' contacts with Massachusetts "represent a purposeful availment of the privilege of conducting activities in [Massachusetts], thereby invoking the benefits and protections of [its] laws and making the defendant[s'] involuntary presence before the state's courts foreseeable." *Pleasant St. Corp.*, 960 F.2d at 1089. "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir.1995) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). The cornerstones of purposeful availment are foreseeability and voluntariness. *See Ticketmaster–New York*, 26 F.3d 201, 207 (1st Cir. 1994).

The defendants direct the court's attention to *Automatic Sprinkler Corp. of America v. Seneca Foods Corp.*, 361 Mass. 441, 280 N.E.2d 423 (1972), in which the Supreme Judicial Court found that a defendant had not purposefully availed itself of the privilege of conducting activities within Massachusetts where its only contact with the Commonwealth was its mailing of a purchase order and a check in partial payment to plaintiff in Massachusetts and its receipt of a letter and invoice from Massachusetts. *See id.* at 444–46, 280 N.E.2d 423.

The contacts in the case at hand, however, go far beyond *Automatic Sprinkler*. To repeat, the defendants twice sent representatives to Massachusetts to meet with plaintiff regarding the calendering equipment, which was the subject of the parties' contract. Although the defendants attempt to downplay these contacts, they were emphatically *not* random, isolated or fortuitous. *See Sawtelle*, 70 F.3d at 1391. Rather, the visits underscore that the defendants voluntarily directed actions to Massachusetts. Moreover, as discussed above, the parties exchanged multiple telephone calls, faxes and letters, including revisions to the agreement, during the construction process; their communications were therefore significantly more abundant and pertinent to the dispute than those in *Automatic Sprinkler*.

Though not directly analogous to the case at hand, *Good Hope Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 389 N.E.2d 76 (1979), a case upon which both parties rely, provides some guidance. There, the defendant, a Texas corporation, "maintained close contact with the plaintiffs in Massachusetts, initiating more than fifty telephone calls" and mailing appraisal reports to Massachusetts. *Id.* at 9–10, 389 N.E.2d 76. Based on these contacts, the court concluded that the defendant "undertook purposeful activity in the forum." *Id.* at 11, 389 N.E.2d 76. The court reasoned that the Commonwealth would not be "drag[ging] into its courts an 'unsuspecting and unwilling' defendant," and that the defendant "reasonably could have foreseen that significant managerial decisions, based on the information it had provided, would be made in Massachusetts." *Id.* at 10–12, 389 N.E.2d 76 (quoting *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Like the defendant in *Good Hope*, the defendants in this case were in frequent contact with plaintiff in Massachusetts, sent numerous communications to the Commonwealth, and sent two employees to plaintiff's Chicopee facility to explore potential manufacturing or delivery problems. Furthermore, their agreement called for inspection and delivery of the machinery in Massachusetts. In light of

these voluntary contacts, the defendants should have reasonably foreseen the possibility of being haled into court in Massachusetts if litigation arose. Accordingly, this court finds that the defendants purposefully availed themselves of the privilege of conducting activities in Massachusetts.

### 3. *The Gestalt Factors*

The final consideration in the minimum contacts analysis is whether the exercise of personal jurisdiction over defendants would "offend traditional notions of fair play and substantial justice." *Pritzker*, 42 F.3d at 63 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The First Circuit answers this question by considering five "gestalt" factors:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id.* at 63–64 (quoting *Pleasant Street*, 960 F.2d at 1088). Consideration of these factors assists the court in achieving substantial justice, and "[i]n very close cases, they may tip the constitutional balance." *Ticketmaster–New York*, 26 F.3d at 209. This is not a close case; even if it were, these considerations support exercise of jurisdiction in Massachusetts when fairly balanced.

True, appearing in Massachusetts will undeniably burden the defendants somewhat. As the First Circuit has observed, however, "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly." *Pritzker*, 42 F.3d at 62. Accordingly, "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Id.* In *Pritzker*, the court concluded that travel between New York and Puerto Rico was

not an unusual burden. *See id.* This court likewise does not believe that the prospect of travel between Illinois or Michigan and Massachusetts is especially onerous.

The second factor, the forum state's interest, does not weigh heavily in favor of either party. The contract was neither created nor breached in Massachusetts, and the machinery which is its subject is now located in Michigan. Massachusetts nonetheless has some interest in the case to the extent that plaintiff is a Massachusetts corporation.

The third factor, by contrast, clearly favors the exercise of jurisdiction in Massachusetts. The First Circuit "has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle*, 70 F.3d at 1395. Here, plaintiff, a fairly small company, filed suit in Massachusetts. It obviously would be severely inconvenienced by having to travel to Michigan to try this case.

With regard to the fourth factor, as in several First Circuit cases, "the interest of the judicial system in the effective administration of justice does not appear to cut in either direction." *Ticketmaster–New York*, 26 F.3d at 211; *Sawtelle*, 70 F.3d at 1395 (quoting *Ticketmaster–New York*).

Finally, the fifth factor concerns the "interests of the affected governments in substantive social policies." *Pritzker*, 42 F.3d at 64. The policies implicated in this case revolve around the enforceability of contracts. To the extent that the contract was not formed in Massachusetts, the Commonwealth may not have a strong interest; however, neither was the contract formed in Michigan, the forum in which the defendants believe this case belongs. Again, this factor is something of a wash.

In sum, all the "gestalt" factors are either neutral or favor plaintiff. Accordingly, the exercise of jurisdiction in Massachusetts will not offend traditional notions

of fair play and substantial justice. Application of the minimum contacts factors leads this court to conclude that defendants are subject to personal jurisdiction in Massachusetts. The defendants' motion to dismiss for lack of personal jurisdiction will therefore be denied.

### B. Motion to Transfer Venue

In the alternative, defendants seek transfer of this action to the Western District of Michigan. Since the filing of this lawsuit, there have been several developments which bear on the issues raised by defendants' motion. First, in April, 1999, another supplier of machinery for the Benton Harbor facility, Parkinson Machinery, filed suit against defendants in Rhode Island state court. The defendants have removed that action to federal court in Rhode Island and have moved to dismiss it or to transfer venue to the Western District of Michigan. Second, Kohler has now demanded payment of $1.7 million from Nuway. Finally, the defendants in this case have lately filed their own complaint against Fairview, Parkinson and Kohler in federal court in the Western District of Michigan. (Docket No. 19).

With that background in mind, the court turns to the standard for considering a motion to transfer, which Judge Gorton articulated in *Brookfield Machine, Inc. v. Calbrit Design,* 929 F.Supp. 491, 501 (D.Mass.1996):

> A district court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought." § 28 U.S.C. 1404(a).

> The decision to transfer a case pursuant to § 1404 rests within the sound discretion of the trial court. *See Codex Corp. v. Milgo Elec. Corp.,* 553 F.2d 735, 737 (1st Cir.1977). A presumption in favor of the plaintiff's choice of forum exists, and the burden of proving that a transfer is warranted rests with the defendant. *Princess House, Inc. v. Lind-*

*sey,* 136 F.R.D. 16, 18 (D.Mass.1991); *McEvily v. Sunbeam–Oster Co., Inc.,* 878 F.Supp. 337, 344 (D.R.I.1994). In making its determination, the Court must balance several factors, while bearing in mind the fact that plaintiff's choice of forum is entitled to "great weight." *Home Owners Funding Corp. of America v. Century Bank,* 695 F.Supp. 1343, 1347 (D.Mass.1988); *Lindsey,* 136 F.R.D. at 18. Other factors to consider include the convenience of the parties and witnesses, the availability of documents and the interests of justice. *Home Owners Funding Corp.,* 695 F.Supp. at 1347; *Lindsey,* 136 F.R.D. at 18. Of those factors, the convenience to the expected witnesses is "probably the most important factor, and the factor most frequently mentioned." *Lindsey,* 136 F.R.D. at 18.

The defendants first argue that the machinery relevant to this dispute is located in Michigan and that a trier of fact will need to see it in action. This argument fails to persuade. If a view of the machinery in operational mode is truly necessary to resolution of this contractual dispute, it might well be accomplished by videotape or other such means.

The real focal point in the venue dispute is the question of inconvenience to the parties and witnesses. Both parties present compelling arguments on this front. Plaintiff emphasizes that it is a small company and that the transfer of venue would create a severe hardship insofar as a trial in Michigan would pull many of its key employees, who are likely to be witnesses, away from the office in Massachusetts. Similarly, defendants argue that most of their witnesses, including experts, are in Chicago, Michigan and Ohio, and that it will therefore be more convenient for them if the case is heard in Michigan.

No matter where this case is tried, one side or the other will be inconvenienced. Based on the record before it, this court sees no meaningful basis to conclude that

one side will be more inconvenienced than the other or that some witnesses will be put out significantly more than others by traveling to a distant forum. Other considerations being equal, the tie-breaking factor is the "great weight" that this court must give to the plaintiff's choice of forum. This court therefore concludes that the defendants have failed to carry their burden of showing that the proposed transfer is warranted and will deny the motion to transfer venue to the Western District of Michigan.[1]

### C. *Motion for Discovery*

In the event that this court is inclined to allow the motion to dismiss, plaintiff asks to engage in discovery aimed to support its position. Because this court will deny the motion to dismiss, plaintiff's request is moot. The motion for discovery will therefore be denied.

A separate order will issue.

---

1. To the extent that the defendants contend that the various related disputes should be litigated in a single action (Docket No. 19), they are free to move to transfer venue of the other cases to this district.